

100 Galleria Parkway
Suite 1600
Atlanta, GA  30339-5948

Tel: 770.818.0000
Fax: 833.330.3669

www.fmglaw.com

Travis A. Knobbe
Partner

D: 678.996.9054
C: 470.820.2810

travis.knobbe@fmglaw.com

April 22, 2024

*Via E-Mail*
Mintz
Attn: Scott C. Ford
E-mail: scford@mintz.com

Re:  Spiegel, et. al. v. Goldin Auctions, LLC, et. al.
     Civil Action No.: 1:23-cv-1202-KMW
     Subpoena to Andrew Spellman

Dear Counsel:

We write this letter in follow up to the Subpoena issued by the Spiegels to Andrew Spellman. We received and responded to your April 10, 2024 letter objecting to the subpoena in whole cloth. We have not received any response to our invitation to meet and confer concerning the objections. As a result, we follow up to that invitation with this letter.

For reasons that are explained in the attached draft Motion to Compel, the subpoena is specific and targeted to receive information reasonably calculated to lead to the discovery of admissible evidence. We also do not believe the subpoena to be unduly burdensome as it essentially seeks information relating to Spellman's ownership of cards in this specific year's Exquisite Collection that feature LeBron James and communications with between eight and ten parties concerning the Spiegels' LeBron RPA Card and the Spiegels (with only a couple also seeking communications about other LeBron RPA Cards, as defined in the subpoena).

As we have not heard from you, we have little choice but to accelerate our efforts.. If I do not hear from you, we intend to file the attached Motion to Compel on or about April 26, 2024.

Thank you in advance.

FREEMAN MATHIS & GARY, LLP

Travis A. Knobbe

Cc: William W. Cheney (wcheney@fmglaw.com)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETS
# BOSTON DIVISION

|  |  |  |
|---|---|---|
| STEVEN SPIEGEL and<br>ALAN SPIEGEL<br><br>*Plaintiffs*<br><br>v.<br><br>GOLDIN AUCTIONS, LLC;<br>KENNETH GOLDIN;<br>JOHN DOES 1-10; and ABC CORPS.<br><br>*Defendants* | : : : : : : : : : : : : : : : | Civil Action No.<br>1:23-cv-1202-KMW-EAP (District of New Jersey)<br><br>Judge Karen M. Williams |
| STEVEN SPIEGEL and<br>ALAN SPIEGEL<br><br>*Movant*<br><br>v.<br><br>ANDY SPELLMAN<br><br>*Respondent* | : : : : : : : : : : : : : : | Misc. Action No. |

**STEVEN SPIEGEL AND ALAN SPIEGEL'S MOTION
TO COMPEL RESPONSES TO SUBPOENA**

Steven and Alan Spiegel (the "Spiegels") state as follows for their Motion to Compel Responses to Subpoenas (the "Motion") issued against and served on Andrew Spellman ("Spellman").

1. The instant case, filed in the United States District Court for the District of New Jersey, involves a dispute between the Spiegels and Goldin Auctions, LLC and Kenneth Goldin (collectively, "Goldin") concerning the circumstances surrounding the withdrawal of the Spiegels' 2003-04 Upper Deck Exquisite Collection Lebron James Rookie Jersey Patch Autograph card with serial number 44/99 (the "LeBron RPA Card").

2. The Complaint alleges that Goldin encouraged the Spiegels to auction the LeBron RPA Card with Goldin because the LeBron RPA Card could break sales records.

3. The Complaint alleges that Goldin was familiar the background of the LeBron RPA Card with then-anonymous hobby participants questioning whether the patch in the LeBron RPA Card had been swapped prior to the Spiegels' purchase of the LeBron RPA Card.

4. The Complaint further alleges that Goldin assured the Spiegels before the auction of the LeBron RPA Card commenced that Goldin had spoken with the primary anonymous source (Cardporn, now known to be Juan Garcia) attacking the authenticity of the patch in the LeBron RPA Card and that Cardporn assured Goldin that Cardporn did not intend to disrupt the auction.

5. Cardporn, however, started questioning the card and Goldin's decision to auction it immediately, and several hobby influencers weighed in supportive of Cardporn's position that the card was patch-swapped.

6. Those influencers included, but are not limited to, Instagram and other social media accounts with the names "cardcollector291" and "waxmuseumpodcast."

7. Cardporn went so far as to bully Chris Carlin, then a Senior Vice President of Upper Deck, and plant a counter-narrative in Carlin's mind concerning the history of the LeBron RPA Card that does not match the LeBron RPA Card's actual history.

8. Carlin had previously written a letter on behalf of Upper Deck (the LeBron RPA

Card's manufacturer) that verified that the patch in the LeBron RPA Card was indeed authentic and had not been swapped as alleged (the "Upper Deck Letter").

9. For the Spiegels' part, in October 2019 they first received information suggesting, that their LeBron RPA Card had been "patch-swapped."

10. This source was Spellman.

11. They asked Spellman common-sense questions about the veracity of that information, but Spellman was unwilling to provide any further support.

12. According to conversations Spellman had with the Instagram User known as "WaxMuseumPodcast" (hereafter, "Yerkes"), Spellman formed a negative impression of the Spiegels based on their questions about the veracity and origin of the photo Spellman shared with them.

13. As a result, the Spiegels wrote to Upper Deck to see if the LeBron RPA Card's manufacturer could shed light on the card's history.

14. The Spiegels believed the matter to be wholly resolved by the Upper Deck Letter, particularly as the single photo suggesting the narrative expressed in the Upper Deck Letter and the assertion in the Upper Deck Letter that the patch in the LeBron RPA Card had *not* been swapped was false had dubious origin at best.

15. After ending the auction of the Spiegels' LeBron RPA Card, Goldin thanked "cardcollector 291 for digging up a key photo I needed and to cardporn for all their behind the scenes work throughout this process from the time the preview hit to when we pulled the card" in his social media post explaining his decision to end the auction of the LeBron RPA Card.

16. The user who ran the account "cardcollector291" was subsequently hired by Goldin and was identified as Michael Cramer ("Cramer") in Goldin's initial disclosures and discovery

responses.

17. Subsequent discovery obtained in this case suggests strongly that the origin of the single photo used to call the LeBron RPA Card into question is worse than "dubious" but rather was shared by a group of high-end collectors of LeBron James cards who controlled a substantial percentage of the market of all available versions of the LeBron RPA Card.

18. The individuals in that group include, but are not limited to, Matt Allen ("Allen"), who held himself out to be a private sales consultant for Goldin with direct supervisory/oversight over Goldin's entire private sales team otherwise led by Frank DiNote.

19. The group also includes Spellman who originally sent the photo to the Spiegels that led the Spiegels to contact Upper Deck resulting in the Upper Deck Letter being issued.

20. Spellman refused to answer questions by the Spiegels concerning the origin of the photo, apparently believing that his standing in the exclusive community of high-end LeBron James collectors should stand for itself.

21. Indeed, when Spellman shared the alleged photo showing an alleged side-by-side comparison of the Spiegels' LeBron RPA Card with two different patches, the Spiegels asked, simply, "where did u see that." Spellman responded "I don't have time for this stuff. I am just telling you that's your LeBron card before the patch was switched. I am sorry if you didn't know this and someone duped you."

22. Spellman called the Spiegels "scum" because they "saw the pic" Spellman sent them (and about which Spellman refused to answer questions about where it came from) and listed the card on eBay.

23. Spellman also referred to the Spiegels trying to sell a "fake bird magic psa 10," in the discussion with Yerkes, not knowing that the Spiegels were nearly induced to purchase this

card themselves by someone who was under active investigation by the FBI for forgery. The Spiegels did not end up purchasing or selling the card and offered to cooperate with the FBI to purchase the card at their own expense to catch the forger.

24. This did not stop Spellman from calling the Spiegels "weird" for "acting like religious then showing this monster card" and concluding when asked whether the Spiegels were naïve or crooked that they "must be" crooked.

25. Spellman stated in the conversation with Yerkes that the "guy who shared [the alleged white patch photo] said [it came from] ebay and he is a known monster Lebron collector" and subsequently identified the source as "buy buy MJ."

26. The Spiegels first became aware after their Complaint was filed that Spellman shared the alleged photo of the Spiegels' LeBron RPA Card with Yerkes who, in turn (and, unwittingly, it appears), fed the information to Goldin and to Cardporn.

27. The drip feed appears somewhat calculated because the origin source of the photo was not revealed until later in the conversation, Spellman never shared the photo publicly, the alleged origin source "buybuymj" never shared the photo publicly, and the individuals instead used Yerkes to spread the alleged information about the Spiegels' LeBron RPA Card.

28. Nonetheless, when the Spiegels first learned that the photo may have come from "buybuymj," they also reached out to this account for information concerning the origin of the photo, and the user was unwilling to provide additional details beyond the photo and the claim that he stored it on his hard drive along with additional information that he refused to provide "in case there was litigation" in the future.

29. Because the LeBron RPA Card is one in a series of just 99 cards, along with 23 more versions of the same card with a different trim and with a lower print run (23 serial numbered

versions), the card is rare.

30. Indeed, according to Karvin Cheung, who was previously employed by Upper Deck to design the Exquisite Collection, the total print run of 122 versions of the card was the lowest number certain grading companies would allow at the time to call the card a true "rookie" card, making this LeBron rookie one of the rarest (if not *the* rarest) of all LeBron rookie cards.

31. Thus, any party who holds multiple copies of this card has incentive to further narrow the number of cards within the limited print run that remain "pure" or unspoiled by questions about the authenticity of the card in its current condition.

32. The exclusive group of collectors of this card have attacked other versions of the card while dodging questions about their own versions.

33. Indeed, Goldin sold the version of the LeBron RPA Card serial numbered 23/99 on October 24, 2021, for $2,400,000.00. This auction began just four months after Goldin ended the auction of the Spiegels' LeBron RPA Card.

34. Allen was the purchaser of this card and he commented on his own Instagram account, "this was a steal of a price!" He continued, "I'm still surprised I was able to obtain it so low yet I also knew the 'new market' didn't understand the significance of this truly special 'jersey number' piece just yet."

35. Allen previously showed off his LeBron RPA Cards numbered 66/99 and 06/99. When he purchased the 06/99, he said he was "waiting for one special one to act like a boomerang."

36. At the time of the auction of the Spiegels' LeBron RPA Card, Allen had two versions of the card and was angling for at least another one.

37. Allen had the incentive to keep the market down in order to purchase the 23/99 for a "steal" and to "wait[ ] for one special one to act like a boomerang."

38. This is particularly true considering the 23/99 was the next card to be auctioned by Goldin after Goldin ended the auction of the Spiegels' LeBron RPA Card and Allen, given his connection with Goldin, almost assuredly would have known at the time the Spiegels' LeBron RPA Card went live that the 23/99 (graded an 8.5 versus a 9 that the Spiegels' RPA Card achieved) was next.

39. It stands to reason that, given the questions about the Spiegels' LeBron RPA Card raised so publicly and loudly once the auction went live, the value of the 23/99 purchased by Allen was artificially depressed such that Allen was able to purchase it for a "steal."

40. Moreover, someone appears to have silenced questions that were raised about the 23/99 and whether the signature was traced over to fill in gaps in the autograph shown in prior images of the card before it was graded, raising further questions about the lengths to which participants in the exclusive high-end LeBron memorabilia market were willing to go to inflate the value of their assets.

41. The two members of this group known to the Spiegels presently own, upon information and belief, at least eight different versions of the LeBron RPA Card (three by Allen and five by Spellman), representing a market share of approximately 7%. For each different LeBron RPA Card that is successfully "questioned," the members increase their representative market share by approximately 1%.

42. The user known as "waxmuseumpodcast" left a chat group with the participants in this exclusive group of high-end LeBron collectors in which he was a participant and from which he gathered most of the information concerning alleged alterations and patch swaps of multiple versions of the Lebron RPA Card because he was "tried of dealing with all the lebron people" as they were "insufferable." (He stated same in a January 10, 2023, private message to Cardporn.)

43. Allen weighed in on the Spiegels' LeBron RPA Card after the auction was ended with a photo making fun of the Spiegels and portraying them as Smeagol from Lord of the Rings with a yamaka which he shared to his Instagram story with a note "[c]ourtesy of one of my ninjas for this mock up."

44. Spellman was featured in a celebratory live video including Matt Allen (shyne150), Andrew Spellman (fifthdownsportscards), and Cramer (cardcollector291) applauding Goldin's decision to end the auction.

45. Spellman had reason to act against the LeBron RPA Card and, based on communications obtained between Spellman and "waxmuseumpodcast" personally (and vehemently) disliked the Spiegels.

46. Given that he appears to be the one who shared the photo relied on by Goldin to withdraw the auction with "waxmuseumpodcast," who, in turn, shared it with Cardporn, Spellman is a critical source of discovery in this case.

47. Based on this information that has been obtained by the Spiegels, the Spiegels issued the subpoena attached as **Exhibit A** to Spellman.

48. In that subpoena, they asked for documents (a) showing communications Spellman had with Cardporn (who publicly pressured Goldin to withdraw the auction of the LeBron RPA Card), Chris Carlin (who authored the Upper Deck Letter), Upper Deck (the manufacturer), Karvin Cheung (the designer of the card), cardcollector291 (the individual thanked by Goldin for revealing information about the LeBron RPA Card), buybuymj (the alleged origin source of the photo Spellman shared concerning the LeBron RPA Card), Yerkes, and Allen concerning the Spiegels' LeBron RPA Card, the Spiegels, or other LeBron RPA Cards; (b) all photos Spellman possesses of the LeBron RPA Card; (c) images of other versions of the LeBron RPA Card owned

by Spellman; (d) information showing his purchase and/or sale of other versions of the LeBron RPA Card; and (e) communications concerning the Spiegels' LeBron RPA Card with anyone not named above.

49. The requests are specifically targeted at information relevant to the case. Each of Carlin, Cheung, Goldin, Cardporn, Allen, Yerkes and Cramer are material witnesses (as is Spellman) concerning the factual background leading to the withdrawal by Goldin of the Spiegels' LeBron RPA Card from auction. Spellman's communications with them concerning the Spiegels, the Spiegels' LeBron RPA Card, and other LeBron RPA Cards of the same serial-numbered set are not only limited in scope but also specifically calculated to lead to the discovery of admissible evidence.

50. Communications with others that relate solely to the Spiegels' LeBron RPA Card are also limited and specifically calculated to lead to the discovery of admissible evidence.

51. Given the potential that exists for market manipulation and questions surrounding the motivations of individuals (raised in part by the celebratory video of Cramer, Allen, and Spellman about Goldin's decision to withdraw the Spiegels' LeBron RPA Card from auction), the requests concerning the copies of the card owned by Spellman are also reasonably calculated to lead to the discovery of admissible evidence.

52. Unless Spellman had dozens of separate conversations concerning the Spiegels and their LeBron RPA Card with dozens of different people (which would raise its own set of issues), the communications sought involve between eight and ten discrete different communication counterparties concerning two (sometimes three) discrete topics.

53. As a result, the requests are not burdensome to Spellman, especially considering there are several trusted software apps one can use to collect information from one's own computer

or mobile phone.

54. Spellman, by the way, was contacted by Yerkes on September 5, 2023, and told that his name was "slated to come up in the conversations regarding lbj rpa 44/99."

55. Oddly, counsel for Spellman did not even know at that time that the Spiegels would have reason to subpoena Spellman.

56. As such, the issuance of a subpoena should not come as a surprise to Spellman.

57. On April 10, 2024, Spellman, through counsel, responded to the subpoena by objecting to the same in whole cloth.

58. Included in the grounds for objection was the contention that "no fees were tendered with the Subpoena as required by Fed. R. Civ. P. 45(b)(1)." That subpoena, however, is *not* a subpoena for testimony. Instead, it is a subpoena for production of documents *only*. While the Spiegels certainly reserve all rights to subpoena Spellman for a deposition, they prefer to do so after having had time to review documents responsive to their requests.

59. The letter also objected to the subpoena on the basis that it is overly broad and vague. The Spiegels address that comment above.

60. The letter further objects on the basis that the subpoena requested privileged documents, which it does not. If it did, the objection can be resolved by the production of a privilege log.

61. The letter objects that the subpoena will require disclosure of confidential information. Considering the subpoena requests information concerning Spellman's ownership of trading cards and Spellman's communications with third parties who are not attorneys, accountants, or other individuals with whom Spellman may hold some special relationship, the subpoena, by its very nature, does not seek confidential information.

62. The letter objects further than the subpoena will cause undue burden and expense, and the Spiegels address this point above.

63. Finally, the letter objects that the subpoena does not allow reasonable time for compliance.

64. The subpoena gives Spellman the longer period of April 12, 2024, or 14 days from the date of service to comply. The subpoena also specifically invited Spellman to contact issuing counsel with any questions or concerns with the "aim to make the process of providing documents responsive to subpoenas as convenient as possible."

65. As such, the Spiegels are more than willing to allow up to 30 days from the date of service to Spellman to respond to the subpoena, should that time be required.

66. Issuing counsel e-mailed counsel for Spellman on April 10, 2024, inviting a conversation to resolve any objections and work together to set forth a time for compliance.

67. Counsel followed up with a good faith letter on April 22, 2024.

68. Spellman has been unwilling to provide any documents in response to the subpoena.

WHEREFORE, the Spiegels respectfully request the entry of an Order compelling Spellman to respond in full to the subpoenas issued on them within five (5) calendar days of the entry of such order and overruling the objections of Spellman to the subpoena.

Dated: April 26, 2024

By: */s/ Travis A. Knobbe, Esquire*
    For the Firm
**FREEMAN MATHIS & GARY, LLP**

William W. Cheney, III, Esquire
Travis A. Knobbe, Esquire, admitted *pro hac vice*

3 Executive Campus, Suite 350
Cherry Hill, NJ 08002
856-406-1268
wcheney@fmglaw.com
travis.knobbe@fmglaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| STEVEN SPIEGEL and ALAN SPIEGEL | : : : : : | Civil Action No. 1:23-cv-1202-KMW-EAP |
| *Plaintiffs* | : : | |
| v. | : : | Judge Karen M. Williams |
| GOLDIN AUCTIONS, LLC; KENNETH GOLDIN; JOHN DOES 1-10; and ABC CORPS. | : : : : : | |
| *Defendants* | : : | |

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on April 29, 2024, a true and correct copy of the foregoing Motion to Compel was served upon the following via e-mail:

Reade W. Seligman
Alston & Bird LLP
90 Park Avenue, 15th Floor
New York, New York 10016
reade.seligmann@alston.com

Jonathan D. Parente
Andrew A. Roberts
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
jonathan.parente@alston.com
andrew.roberts@alston.com

    By: */s/ Travis A. Knobbe, Esquire*
For the Firm
Attorneys for Plaintiffs,

Steven Spiegel and Alan Spiegel